**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PAUL EZRA RHOADES,
          *Petitioner-Appellant,*

          v.

JEFF HENRY, of the IMSI,
Department of Corrections State of
Idaho*

          *Respondent-Appellee.*

No. 07-99022
D.C. No.
CV-93-00155-S-EJL
OPINION

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Argued and Submitted
February 3, 2010—Seattle, Washington

Filed March 8, 2010

Before: Pamela Ann Rymer, Ronald M. Gould and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Rymer

---

*Jeff Henry is substituted for his predecessor, Arvon J. Arave, Department of Corrections State of Idaho. Fed. R. App. P. 43(c)(2).

3511

RHOADES v. HENRY (Baldwin)

---

**COUNSEL**

Oliver W. Loewy, Federal Defender Services of Idaho, Moscow, Idaho, for the petitioner-appellant.

L. LaMont Anderson, Deputy Attorney General, Boise, Idaho, for the respondent-appellee.

---

**OPINION**

RYMER, Circuit Judge:

An Idaho jury found Paul Ezra Rhoades guilty of the 1987 first degree murder, first degree kidnapping, and robbery of Stacy Baldwin.[1] The trial court sentenced him to death for

---

[1]Rhoades was separately convicted for the shooting deaths of Susan Michelbacher and Nolan Haddon, both of whom were killed with the same gun that killed Baldwin during the same three-week period in February

both the murder and the kidnapping, and to a fixed term of life in prison for robbery. The Idaho Supreme Court upheld his conviction, sentence, and denial of post-conviction relief, *State v. Rhoades* (Baldwin), 820 P.2d 665 (Idaho 1991) (*Rhoades I*), and the federal district court denied his petition for a writ of habeas corpus. Rhoades appeals, and we affirm.

I

Rhoades had been loitering around convenience stores in the Blackfoot and Idaho Falls area, including the Red Mini Barn in Blackfoot. Stacy Baldwin worked at the Red Mini Barn and began her night shift around 9:45 p.m. on February 27, 1987. Some time before 11:00 p.m., Carrie Baier and two other girls rented videos at the Mini Barn from Stephanie Cooper, Baldwin's co-worker. Cooper's shift ended at 11:00 p.m, which left Baldwin alone.

When Baier returned around midnight, she noticed a man leave the store, get into a pickup truck (it turned out to be one used by the Rhoades family), and drive recklessly toward her. Baier saw a passenger next to the driver, but neither she nor her friends could identify the driver or the passenger. Baier went into the Mini Barn but could not find Baldwin, though Baldwin's coat was still there and her car was outside. The last recorded transaction at the store was at 12:15 a.m. $249 was missing from the cash register.

and March of 1987. He was sentenced to death on his convictions for first degree murder, and first degree kidnapping, of Michelbacher, *see State v. Rhoades* (Michelbacher), 822 P.2d 960 (Idaho 1991), and received two indeterminate life sentences for the Haddon murder after entering a conditional guilty plea, *see State v. Rhoades* (Haddon), 809 P.2d 455 (Idaho 1991). Appeals from denial of federal habeas relief in both cases are also before us; we resolve them in separate opinions. *Rhoades v. Henry* (Michelbacher), No. 07-99023, slip op. (9th Cir. March 8, 2010); *Rhoades v. Henry* (Haddon), No. 07-35808, slip op. (9th Cir. March 8, 2010).

Rhoades and another male had coffee at Stan's Bar and Restaurant, near the Mini Barn, sometime between 1:30 a.m. and 2:00 a.m. on February 28.

Baldwin's body was found later that morning near some garbage dumpsters on an isolated road leading to an archery range. She had been shot three times. According to a pathologist, Baldwin died from a gunshot wound to the back and chest, but may have lived for an hour or so after the fatal shot was fired.

On March 22 or 23, Rhoades's mother reported her green Ford LTD had been stolen. Rhoades was seen driving a similar looking LTD on March 22, and on March 24, truckers saw the LTD parked on a highway median in Northern Nevada. They also saw a person matching Rhoades's description lean out of the car, fumble with a dark brown item, and run off into the sagebrush. A Nevada trooper responding to the scene found a .38 caliber gun on the ground near the open door of the car, and a holster about forty-five feet away. Ballistics testing would show that this weapon had fired the bullets that killed Baldwin.

Rhoades turned up about 11:00 in the morning of March 25 at a ranch a mile and a half from where the LTD was found. Later that day, he got a ride from the ranch to Wells, Nevada, where he was dropped off at the 4 Way Casino around 9:00 p.m. Nevada law enforcement officers arrested Rhoades while he was playing blackjack. They handcuffed him, set him over the trunk of the police car, and read him his *Miranda* rights.[2]

Meanwhile, Idaho authorities were alerted to a Rhoades connection when the LTD was discovered. They had previously obtained a warrant for Rhoades's arrest for burglary of Lavaunda's Lingerie, and arrived at the 4 Way Casino shortly after Rhoades was arrested. As the Idaho officers — one of

---

[2]*Miranda v. Arizona*, 384 U.S. 436, 467-72 (1966).

whom Rhoades knew from home — approached, Rhoades said: "I did it." Rhoades was advised of his *Miranda* rights by an officer from Idaho, Victor Rodriguez, and searched by another Idaho officer, Dennis Shaw. Rhoades had a digital wrist watch in his pocket, which he claimed to have found in a "barrow pit." It was just like the one Baldwin was wearing the night she was killed.

During the booking process at the Wells Highway Patrol Station, Shaw remarked something to the effect: "If I had arrested you earlier, Stacy Baldwin may be alive today." Rhoades replied: "I did it." Shaw then said, "The girl in Blackfoot," and Rhoades again replied, "I did it."[3]

Forensic analysis would show that footprints found in the snow near Baldwin's body were consistent with the size and pattern of Rhoades's boots, and that Rhoades's hair was consistent with a hair on Baldwin's blouse. Rhoades also admitted to a cellmate that he kidnapped Baldwin, took her to an archery range intending to rape her but was unable to do so because she was hysterical, and shot her twice in the back.

## II

Based on this evidence, the jury found Rhoades guilty of murder in the first degree, kidnapping in the first degree, and robbery. The state court held an aggravation and mitigation hearing, after which it sentenced Rhoades to death on the conviction for first degree murder and the conviction for first degree kidnapping. Rhoades filed a direct appeal and sought post-conviction relief, which the trial court denied after hold-

---

[3]Shaw actually referred to all three murders, along the lines: "If I had arrested you earlier, three people would be alive" followed by "The girl in Blackfoot, and the two people in Idaho Falls." However, to avoid prejudice, the parties stipulated that at trial Shaw would refer only to Baldwin and "the girl in Blackfoot." For ease, we collapse the two "I did it" statements at the station into one, and refer to the two collectively as the *second* "I did it" statement.

ing evidentiary hearings. Once that denial was appealed, the Idaho Supreme Court consolidated both appeals in accord with its procedure for capital cases. It affirmed Rhoades's convictions, death sentences, and denial of post-conviction relief on September 12, 1991. The United States Supreme Court declined to issue a writ of certiorari.

Rhoades filed a Statement of Issues in federal court on April 29, 1993, and a Petition for Writ of Habeas Corpus on November 30, 1993. The Antiterrorism and Effective Death Penalty Act (AEDPA), which became effective April 24, 1996, is not applicable except to procedural requirements for seeking review. *Sims v. Brown*, 425 F.3d 560, 562 (9th Cir. 2005).

As one would expect, there were several amendments to the petition and numerous rulings by the district court.[4] Among decisions pertinent to this appeal, the district court denied Rhoades's request for an evidentiary hearing on claims that the state withheld exculpatory evidence, that Rhoades's *Miranda* rights were violated, and that appellate counsel rendered ineffective assistance. Ultimately the district court denied all of Rhoades's claims, as well as his motion to alter and amend the Memorandum Decision and Judgment pursuant to Federal Rule of Civil Procedure 59.

Rhoades has timely appealed those grounds on which he received a certificate of appealability.

### III

We review *de novo* the district court's decision to grant or

---

[4]While federal proceedings were pending, Rhoades filed two successive post-conviction petitions in state court November 4, 1996, which were denied by the trial court. The Idaho Supreme Court dismissed appeals from both judgments. *State v. Rhoades*, No. 29180/29212, slip op. (Idaho Dec. 12, 2005).

RHOADES v. HENRY (Baldwin)                    3523

deny a petition for writ of habeas corpus. *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1305 (9th Cir. 1996). We also review *de novo* the district court's decision to dismiss a habeas petition for procedural default or for failure to exhaust. *Vang v. Nevada*, 329 F.3d 1069, 1072 (9th Cir. 2003). Similarly, "[i]neffective assistance of counsel claims are mixed questions of law and fact which we review *de novo*." *Beardslee v. Woodford*, 358 F.3d 560, 569 (9th Cir. 2004).

"To the extent it is necessary to review findings of fact made in the district court, the clearly erroneous standard applies." *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002). This clear error review is "significantly deferential," and our court "must accept the district court's factual findings absent a 'definite and firm conviction that a mistake has been committed.' " *Id.* (citation omitted). Further, "[a]lthough less deference to state court factual findings is required under the pre-AEDPA law which governs this case, such factual findings are nonetheless entitled to a presumption of correctness unless they are 'not fairly supported by the record.' " *Id.* (citations omitted).

"A district court denial of an evidentiary hearing is reviewed for abuse of discretion." *Beardslee*, 358 F.3d at 573.

IV

Rhoades argues that exclusion of testimony regarding Keven Buchholz's confessions to the Baldwin murder denied him due process.[5] Buchholz was arrested at his parents' home

---

[5]Rhoades failed to pursue this claim in his first post-conviction petition, therefore the Idaho Supreme Court treated it as waived. *Rhoades v. State*, 17 P.3d 243, 247 (*Rhoades II*) (Baldwin) (Idaho 2000). By the same token, the state failed to assert procedural default in district court. We decline *sua sponte* to consider this issue.

Rhoades further argues that the court's ruling was erroneous under the Idaho Rules of Evidence. However, evidentiary rulings based on state law cannot form an independent basis for habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

3524          RHOADES v. HENRY (Baldwin)

on March 14, 1987, after his father called the police to report a fight. At the jail, Buchholz, while quite drunk, told the officer on duty that evening, Larry Christian, that he had shot the girl from the Mini Barn twice in the back. Christian reported the conversation to his supervisor, then returned. Buchholz repeated that he shot the girl from the Mini Barn twice in the back, had shot several times around the body, and had emptied the gun. Rhoades tried, unsuccessfully, to subpoena Buchholz for trial. He then sought to call Christian to testify to what Buchholz told him.

Buchholz recanted the confession once sober, explaining that he was with his family the night of the murder. Family members confirmed this. In addition, Buchholz's fingerprints, hair sample, and shoe prints were taken; none matched anything connected to the crime.[6] The police could not link Buchholz to the murder weapon, and determined that information in his confession could have come from public sources or gossip in the community.

The state moved to exclude Christian's testimony. Rhoades presented an offer of proof indicating that Christian would testify that Buchholz told him he shot the girl twice in the back; shot at her several times; stole a green pickup in Pocatello which he left at Fort Hall; and the gun was either a .38 caliber or a 9mm. The proffer also indicated that shell casings from both sizes were found at the scene. The trial court precluded Christian from testifying because it found that Buchholz's confession lacked sufficient corroboration to be trustworthy, thus Christian's testimony about what Buchholz told him would be hearsay under Rule 804(b)(3) of the Idaho Rules of Evidence.[7]

---

[6]Buchholz also took a polygraph examination, but that test is irrelevant because polygraph results are inadmissible under Idaho law absent a stipulation. *State v. Fain*, 774 P.2d 252, 256-57 (Idaho 1989).

[7]Under Idaho Rules of Evidence 804(b)(3), an unavailable declarant's statement against interest "tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

Christian and Buchholz both testified at a post-conviction evidentiary hearing. The evidence showed that Buchholz was out of control at his parents' home, his father called the police, and he was arrested for battery and resisting arrest. He was placed in a holding tank, and asked to talk to Christian. Christian described Buchholz as "well out of it, as far as being drunk," crying, upset, fighting, and "trying to give him a reason to lock him up." Christian also explained that it was generally known that a green Ford pickup was found near Fort Hall, and the police knew that Stacy had been shot in the back. Buchholz agreed that he was drunk, and had gotten into a fight with his parents. Officer Love (whom he knew) responded to his father's call and took him to jail; Love ran through a list of things they could book him for, to which Buchhoz replied "You might as well book me for murder, too." Buchholz explained that he was under the influence, upset with the officer and his parents, and had made the statement to get attention because he thought they were piling on unfair charges. Buchholz also testified that he was at the hospital when Stacy's body was brought in because his daughter had appendicitis.

**[1]** The district court concluded that Buchholz's statement lacked "persuasive assurances of trustworthiness" as he was intoxicated when he confessed and recanted when he was sober, his alibi checked out, and there was no other evidence linking him to the crime. *See Chambers v. Mississippi*, 410 U.S. 284, 300-01 (1973). We agree.

**[2]** Rhoades relies heavily on *Chambers*, where a third party confessed on four separate occasions before recanting, and the Court found that a hearsay rule could not be applied to prohibit introduction of those confessions without offending due process. He points out that Buchholz also confessed several times — once to the arresting officer and twice to Christian. The circumstances are different, however, as Buchholz's confessions occurred during a single, continuous tirade. The fact that he said the same thing three times in one out-

burst does not make his otherwise untrustworthy statement trustworthy. The circumstances surrounding the Buchholz confession are likewise different from those in cases such as *Green v. Georgia*, 442 U.S. 95 (1979), where the proffered statement was reliable enough to have been used against Green's codefendant in a related trial; *Rock v. Arkansas*, 483 U.S. 44 (1987), where the Court held that a *per se* rule against hypnotically-refreshed testimony ran afoul of due process when, as was true there, it had the effect of excluding testimony that was supported by corroborating evidence; *Crane v. Kentucky*, 476 U.S. 683 (1986), where the issue was voluntariness and credibility; *Holmes v. South Carolina*, 547 U.S. 319 (2006), where the Court rejected as arbitrary a rule that made admissibility turn on the strength of only the prosecution's evidence; and *Washington v. Texas*, 388 U.S. 14 (1967), which involved direct (rather than hearsay) testimony by principals, accomplices or accessories to the crime and where the Court held that the evidence could not be excluded based on a priori categories that presume an entire class of witnesses to be unworthy of belief.[8]

[3] Rhoades also posits a different result were we to apply the balancing test of *Miller v. Stagner*, 757 F.2d 988, 994-95 (9th Cir. 1985).[9] Whether or not the test is applicable in the circumstances of this case, applying it would not change the

---

[8]Rhoades's reliance on our decisions in *Thomas v. Hubbard*, 273 F.3d 1164, 1177 (9th Cir. 2002) (as amended), and *United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996), is misplaced for the similar reason that neither involved hearsay testimony.

[9]As restated in *Alcala v. Woodford*, 334 F.3d 862, 877 (9th Cir. 2003) (nonnumerical alteration in original):

> In weighing the importance of evidence offered by a defendant against the state's interest in exclusion, the court should consider [1] the probative value of the evidence on the central issue; [2] its reliability; [3] whether it is capable of evaluation by the trier of fact; [4] whether it is the sole evidence on the issue or merely cumulative; and [5] whether it constitutes a major part of the attempted defense. A court must also consider [6] the purpose of the [evidentiary] rule; [7] its importance; [8] how well the rule implements its purpose; and [9] how well the purpose applies to the case at hand. The court must give due weight to the substantial state interest in preserving orderly trials, in judicial efficiency, and in excluding unreliable or prejudicial evidence.

outcome. Of course a confession may have great probative value, but it also may not, and if not — as here — it may be excluded. *Holmes*, 547 U.S. at 326. With nothing to back up Buchholz's confession, it was unreliable. The jury would have had no opportunity to evaluate Buchholz's credibility and demeanor; Christian's testimony would have been the only testimony on the issue. Christian's recitation could not realistically have been a major part of Rhoades's defense given the circumstances in which Buchholz's statements were made, his recantation and alibi, and the dearth of independent evidence tying Buchholz to the crime. Further, an evidentiary rule such as Idaho Rule of Evidence 804(b)(3) serves the important role of excluding testimony that lacks significant indicia of reliability. *See United States v. Fowlie*, 24 F.3d 1059, 1069 (9th Cir. 1994) (holding that application of Federal Rule of Evidence 804(b)(3), which is virtually identical to the Idaho Rule, does not violate due process). Exclusion of Christian's testimony advances this purpose.

**[4]** Accordingly, we conclude that Rhoades's due process rights were not violated by precluding Christian from testifying about what Buchholz told him.

V

**[5]** It follows that Rhoades cannot prevail on the related argument that his counsel was ineffective for failing to conduct an adequate investigation into Buchholz's confession, or failing to argue on appeal that due process mandated its admission. Simply put, neither would have gone anywhere. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (holding that petitioner must show prejudice as well as deficient performance). Rhoades suggests that counsel could have discovered there were shell casings on the ground consistent with Buchholz's confession, and that details related by Buchholz were accurate but not yet public, for example, that Baldwin had been shot twice in the back. However, whether there were shell casings on the ground, or Buchholz correctly

described some elements of the crime, doesn't matter without evidence linking Buchholz to Baldwin, to the scene, or to the murder weapon. Rhoades also suggests that counsel would have found out the lie detector results, but whether Buchholz did (or did not) pass the lie detector test would have made no difference because it wasn't admissible, anyway. And given no due process violation, as we have explained, there is no reason to suppose that state appellate counsel making the same arguments that Rhoades now makes would have been successful in changing the outcome.

**[6]** Rhoades offers no support for his further argument that the district court should have held an evidentiary hearing on the issue. We review denial of an evidentiary hearing for abuse of discretion, *Beardslee v. Woodford*, 358 F.3d 560, 573 (9th Cir. 2004), and see none.

## VI

**[7]** Rhoades asserts three supposed *Brady*[10] violations: First, the state's failure to disclose that he invoked his right to silence en route from the 4 Way Casino to the Wells Highway Patrol Station, which he maintains had the effect of making it appear that the second "I did it" statement waived his right. Second, the prosecution's failure to disclose all the police reports regarding Buchholz's confession, which would have shown that he confessed multiple times, thereby making testimony about it admissible. And third, the state's failure to disclose a recorded statement of Loretta Wallace (one of the three girls near the Mini Barn at midnight) whose description of the pickup truck more closely matched the one Buchholz

---

[10]*Brady v. Maryland*, 373 U.S. 83, 87 (1963) (imposing duty on the prosecution to disclose material evidence favorable to an accused). Three requirements must be met to prove a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

claimed to have driven than the one that Rhoades sometimes drove. He also maintains that the district court should not have denied an evidentiary hearing on the first two issues.

## A

The Idaho Supreme Court implicitly found that Rhoades impliedly waived his right to silence by choosing to say "I did it" in response to Shaw's comment at the station that the victim would be alive had Rhoades been arrested earlier. Rhoades submits this couldn't have happened if he, and the Idaho courts, had been aware of a report by Detective Shaw reflecting that Rhoades invoked his right to silence on the way to the station. He maintains that the report only came to light in connection with Shaw's deposition taken in 1996.

In the report, Shaw states:

> On the way to the police station I continued to talk with [Rhoades]. He was very uncomfortable as he was so large and the car did not give him much room. I told him I was disappointed in him and he had lied to me about the burglary. I had tried to believe him and give him a chance but he had lied and conned me. I said we need to talk about it now so that you can get it off your chest. He said, "Aw bullshit, I don't want to talk about it.[ ] Get these fuckin cuffs off me."

At his deposition, Shaw explained that he was talking about the Lavaunda's Lingerie burglary in the car because he wanted to start chronologically and that's where his warrant was. Shaw assumed that when Rhoades said he didn't want to talk about it, it was because Rhoades was cramped. Once inside the station, Shaw removed the handcuffs and proceeded to talk.

Rhoades contrasts this account with Shaw's testimony at the July 15, 1987 preliminary hearing, where he said that the only significant thing that happened en route from the casino to the station was that Rhoades, who is a large man, was uncomfortable and complained about being handcuffed in the car. Rhoades also points out that it was several months before the second "I did it" statement was put into any report, and then not by Shaw. From this, Rhoades postulates that Shaw viewed the interrogation in the car and at the station as a single, continuous event, and forgot all of it.[11]

The district court found that Rhoades failed to show that his trial counsel, David Parmenter, was unaware of the information in the report. Parmenter testified at his deposition that he believed he had seen the Shaw report and was familiar with some of the information in it, though he later submitted a declaration indicating that he did not recall that the state ever provided the report. Rhoades challenges this finding only on the footing that it should not have been made without an evidentiary hearing, but the district court had discretion to rule on the record as it was given no evidence that counsel did not have information that was in the report — whether or not he had the report itself. *See Swan v. Peterson*, 6 F.3d 1373, 1384 (9th Cir. 1993) (holding that a petitioner is "entitled to an evidentiary hearing only if [he] alleged facts that, if proved, would entitle [him] to relief.").

**[8]** In any event, as the district court further observed, Rhoades was the one who said "I don't want to talk about it."

---

[11]In passing, Rhoades suggests he diligently pursued facts showing that he had invoked his right to silence, a point he does not develop and we accordingly do not address; and he urges us not to ignore the fact that the prosecution failed to mention an en route invocation in the Michelbacher and Haddon cases as well. As the Idaho courts treated these cases separately, so do we. But if we were to move past the record in this case, the prosecutor in fact called Rhoades's counsel's attention to the Shaw report at a discovery conference in the Haddon case. *See Rhoades* (Haddon), slip op. at 3608-09.

In other words, Rhoades possessed the facts that he now claims were concealed — unless, as he also claims, he was too far out of it to be aware of what he had said. As to that, there is no question Rhoades appeared high, under the influence of drugs or alcohol, when he was arrested. Despite this, the Idaho Supreme Court determined that Rhoades "had sufficient capacity to understand what was going on around him." *Rhoades I* (Baldwin), 820 P.2d at 676. Among other things, this was based on an exchange between Rhoades and Shaw during which Shaw, having found three bills totaling $111 on Rhoades and deciding to test Rhoades's alertness, pulled the money out and said "three dollars." Rhoades turned around and said: "There better be a hundred eleven dollars there." It was just after this, in the car, that Shaw brought up the Lavaunda's Lingerie burglary and Rhoades told Shaw "I don't want to talk about it" and to get the handcuffs off. Absent a showing that the supreme court's determination is incorrect, we accept its finding that Rhoades was aware of what was going on. Thus, Rhoades was aware that he was uncomfortable handcuffed in the car, and when Shaw brought up the burglary, he told Shaw he didn't want to talk about it and to take the handcuffs off. These core facts were enough for Rhoades and his counsel to take advantage of whatever exculpatory value they may have had, either by pursuing records, or raising *Miranda*.

**[9]** There is no *Brady* violation when a defendant possessed the information that he claims was withheld. *See Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (so holding when petitioner possessed "the salient facts"). Rhoades made the statement he claims was suppressed, and failed to show that his counsel did not have the salient information. Consequently, there was no *Brady* violation.

## B

Again focusing on Buchholz's confession, Rhoades complains that the prosecutor failed to disclose that Buchholz con-

fessed three times, not just once, and to officers working for different agencies. Blackfoot Chief of Police J. J. Love, who arrested Buchholz, made a report indicating that Buchholz told him he "was the one who killed the girl at the Mini Barn. Why don't you pin it on me. I did it." Christian, the officer who talked to Buchholz at the jail, filled out a report indicating that Buchholz told him he had fired several shots and hit the girl from the Mini Barn twice in the back with a .38 or a 9mm. Detective Newbold, of the Blackfoot Police Department, to whom Christian told what had happened, prepared a report that mentions Christian's written report and summarizes it in detail. The Newbold report was turned over, though neither the Love nor Christian reports was.

[10] As his trial proffer reveals, Rhoades undisputedly knew that Buchholz confessed to Christian that he shot the girl from the Mini Barn. Counsel conceded as much in his post-conviction testimony. His trial proffer also refers to Christian's "more detailed report," so he knew about it as well. All Rhoades apparently didn't have at trial was Officer Love's report, but it added no detail not apparent from the Newbold summary or available from Christian. Without question, Rhoades had all the "salient facts regarding the existence of the [evidence] that he claims [was] withheld." *Raley*, 444 F.3d at 804. Accordingly, the information was not suppressed.

As we have explained, that Buchholz said more or less the same thing to Love on the way to jail as he said to Christian at the jail, all while quite inebriated, isn't material. The defense was armed with a confession, who confessed, to whom and about what. In addition, the trial court in post-conviction proceedings found that Buchholz was credible in his account of why he confessed and why he recanted, and that Rhoades was not prejudiced by non-disclosure of any material related to the confession. The Idaho Supreme Court likewise did not believe the outcome of trial would have been different had the defense received the other police reports. Both determinations are well-supported in the record.

The district court did not abuse its discretion in ruling without an evidentiary hearing. Rhoades fails to suggest why the state post-conviction hearing was inadequate; or why the Idaho Supreme Court's determination that the undisclosed reports were sufficiently summarized in Newbold's report to put counsel on alert, and that the reports were not material, was incorrect.

C

**[11]** Rhoades further claims that the state failed to turn over a recorded statement by Loretta Wallace during which, while in and out of hypnosis, she described a man leaving the Mini Barn whose characteristics did not match Rhoades. It was part of a videotape of the "Baldwin Crime Scene" that had a ten minute gap before the Wallace statement. The claim fails because the videotape was, in fact, disclosed. Counsel just didn't find Wallace's statement. Rhoades points to no authority requiring the prosecution to single out a particular segment of a videotape, and we decline to impose one.[12]

D

**[12]** Finally, the district court found that, considering the suppressed evidence collectively, there was no prejudice. *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (instructing courts to determine whether, had evidence been disclosed, there is a reasonable probability of a different outcome by reviewing impact of withheld evidence collectively, rather than item by item). As the court pointed out, evidence at trial showed that the murder weapon was found just outside the LTD that Rhoades was driving and bullets like those used in the murder

---

[12]*See United States v. Mulderig*, 120 F.3d 534, 541 (5th Cir. 1997) (noting "that 'there is no authority for the proposition that the government's *Brady* obligations require it to point the defense to specific documents with[in] a larger mass of material that it has already turned over' " (quoting *United States v. Mmahat*, 106 F.3d 89, 94 (5th Cir. 1997))).

were inside it. A witness had seen Rhoades with a similar handgun after Baldwin was killed, and Rhoades had bought .38 caliber ammunition like that found in the abandoned car. A pickup he often drove was seen driving away from the Mini Barn when Baldwin disappeared. Footprints around where Baldwin was found were consistent with Rhoades's large-sized boots, as was a hair found on Baldwin's shirt. Rhoades had a watch like Baldwin's in his pocket when he was arrested. He told Shaw "I did it," and admitted to Holm that he kidnapped Baldwin and tried to rape her, told her to pray, and shot her several times, hitting her twice in the back. In the court's view, nothing about this picture would have changed had the defense received the other reports (or found Buchholz and he had testified), and had information about Wallace been presented: the circumstances that made Buchholz's confession unreliable would have come out; and Wallace's statement, even if admissible, would have been cumulative because a description similar to hers was already before the jury through Detective Newbold and cross-examination of Carrie Baier.

**[13]** We conclude as well that non-disclosure of the "missing" information about Buchholz and Wallace does not undermine confidence in the outcome of the trial. *See Kyles*, 514 U.S. at 434 (reiterating that a reasonable probability of a different result is shown "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985))). Information about the "I don't want to talk about it" statement was not suppressed; Rhoades made the statement himself, and failed to show it was unknown to counsel. The strong evidence of guilt would not have been materially altered by Wallace's statement or the Love report. Accordingly, there is no *Brady* violation in any of the respects claimed.

VII

Rhoades argues that the trial court violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by admitting his

second "I did it" statement, and that the district court abused its discretion in denying him an evidentiary hearing on the issue. Alternatively, he submits that he should prevail on the merits.

**[14]** The Idaho Supreme Court characterized Shaw's remark about the victim being alive if he had arrested Rhoades earlier as the functional equivalent of interrogation. Nevertheless, it concluded that Rhoades's second "I did it" statement was admissible because Rhoades had been advised of his rights, had indicated that he understood them, and had not invoked his right to silence. *Rhoades I* (Baldwin), 820 P.2d at 675. (Rhoades's "I don't want to talk about it" statement, made en route to the station, was not before the Idaho courts.) The district court found the supreme court's determination was supported by the record that was before it, presumed this finding to be correct, and found that Rhoades had presented no evidence rebutting the factual finding. The district court further noted that the second "I did it" statement came relatively soon after Rhoades was arrested and *Miranda* warnings were administered. Additionally, in the district court's view, Rhoades's "I did it" response was not the product of coercive interrogation so much as it was uttered during a brief exchange while booking was in process when Shaw made an offhand comment. Thus, the court concluded, Rhoades waived his *Miranda* rights by saying "I did it."

To avoid this conclusion, Rhoades sought to present evidence that was not developed in state court: his "I don't want to talk about it statement." The district court found that Rhoades had been given full and fair opportunities to develop facts having to do with this statement in state court, and had not shown cause and prejudice for failing to do so. In this it did not err, for reasons we have explained: Rhoades made the statement himself, therefore "possessed" it, and did not show that his counsel was unaware of it. Regardless, the district court concluded that, even if the new evidence were considered, Rhoades would still not be entitled to relief. The court

reasoned that the discussion in the car involved an unrelated burglary, not the murder of Stacy Baldwin, and when Rhoades said he "didn't want to talk about it, get these hand-cuffs off" it was in the context of complaining about the cramped conditions in the car. At most, in the district court's view, this amounted to an ambiguous or equivocal statement regarding Rhoades's right to silence. As such, the court held, Rhoades's statement was analogous to the ambiguous reference to assistance of counsel that the Supreme Court held in *Davis v. United States*, 512 U.S. 452 (1994), was insufficient to invoke that particular right or to shut down police questioning. *Id.* at 458.

[15] Rhoades maintains that once the district court assumed that the record had been expanded to include the "I don't want to talk about it" statement, it should have proceeded to determine whether an evidentiary hearing was required under *Townsend v. Sain*, 372 U.S. 293 (1963).[13] Had it done so, Rhoades contends that he would have met three of the *Townsend* factors — (4), (5), and (6) — and the court would have been able to make credibility determinations as well as develop additional facts. However, as the district court found and we have discussed, evidence of the "I don't want to talk about it" statement is not newly discovered as Rhoades made the statement himself and his counsel was aware of information in the Shaw report. This undercuts each of the factors upon which Rhoades relies. The evidence could rea-

---

[13]An evidentiary hearing in federal habeas proceedings is required (1) where the merits of a factual dispute were not resolved in state hearings; (2) the state factual determination was not fairly supported by the record; (3) the state's fact-finding procedure was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) material facts were not adequately developed at the state court hearing, for which there is no cause or prejudice; or (6) for any reason it appears that the state trier of fact did not afford the applicant a full and fair hearing on the facts. *Townsend*, 372 U.S. at 312-13; *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 8-11 (1992) (modifying *Townsend*'s fifth factor).

sonably have been presented to the state trier of fact. *Id.* at 317. Although Rhoades argues that he tried to obtain all of his statements but the state withheld his en route invocation of the right to silence, evidence adduced in post-conviction proceedings supports a contrary conclusion. *Keeney*, 504 U.S. at 8-11 (holding that cause must be shown). Finally, Rhoades does not suggest any respect in which the state trier of fact deprived him of a full and fair hearing. Accordingly, Rhoades was not entitled to an evidentiary hearing under *Townsend*.

Even if the district court's ruling on the merits were not premature, as Rhoades maintains it was, he takes issue with the court's analysis. He argues that clear and convincing evidence rebutted the presumption of correctness accorded to the Idaho Supreme Court's determination that he understood what was going on around him. We disagree. While Idaho officers present at Rhoades's arrest testified that he was high, appeared to be under the influence of drugs, and was impaired at that time, Shaw also testified that Rhoades knew to the dollar how much money he had. This supports the supreme court's finding.

Further, Rhoades faults the district court for dividing Shaw's interrogation into distinct parts, treating the burglary separately from the murder. He suggests that instead, the references to burglary and murder were connected by the sheer number of police officers who showed up, which could indicate that more was afoot than just an ordinary burglary, and by Shaw's comment at the station, which linked the two. In the same vein, Rhoades suggests that it would be fair to assume he knew the subject of Shaw's questioning en route to the station was really homicide so his invocation of the right to silence applied to both. No basis appears in the record to suppose this, however. Shaw was executing an arrest warrant for burglary; he referred in the car only to a burglary about which he and Rhoades had talked in the past, not to murder; and his comment at the station introduced the murder, a different topic, for the first time.

Finally, even if the conversation in the car were limited to the burglary, Rhoades contests the district court's conclusion that his *Miranda* rights were "scrupulously honored" under *Michigan v. Mosley*, 423 U.S. 96 (1975), because Shaw never cut off questioning. *See id.* at 104. We disagree. *Mosley* did not establish a rule of either perpetual duration or of global reach. As the Court explained, the person being questioned "can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Id.* Thus, a person in custody "may waive his right to remain silent selectively, waiving it with regard to some, but fewer than all, topics of discussion." *United States v. Garcia-Cruz*, 978 F.2d 537, 541-42 (9th Cir. 1992) (rejecting petitioner's argument that when he said "I do dictate the gang. And, and, and, and I'm not, that's all I can say," he invoked his right to silence, construing it instead as a selective revocation of a prior waiver). Rhoades's statement in context was at best ambiguous, indicating that he did not want to talk about the burglary and wanted the handcuffs off. Shaw stopped asking Rhoades about the burglary while Rhoades was handcuffed and cramped in the car. The "I did it" statement came after the handcuffs were removed and while Rhoades was being booked at the station, in response to a different point about the murder. In these circumstances no *Mosley* error occurred.

**[16]** We conclude that admitting the second "I did it" statement was not constitutional error.

## VIII

**[17]** Rhoades contends that the trial court gave three instructions — Nos. 16, 17, and 27 — that are constitutionally infirm because they had the effect of lowering the state's burden of proving every element of the offense beyond a reasonable doubt. If so, there would be *Winship* and *Cage* error, and the Due Process Clause of the Fourteenth Amendment would be offended. *In re Winship*, 397 U.S. 358, 364 (1970); *Cage v. Louisiana*, 498 U.S. 39, 39 (1990).

**[18]** We must decide whether "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Morris v. Woodford*, 273 F.3d 826, 833 (9th Cir. 2001). The question is not whether the jury *could have* done so, but whether there is a reasonable likelihood it *did*. *Victor v. Nebraska*, 511 U.S. 1, 6 (1994). And we are not to engage in a "technical parsing" of the language; instead, we should think of the instructions as the jury would — "with a commonsense understanding of the instructions in the light of all that has taken place at trial." *Johnson v. Texas*, 509 U.S. 350, 367 (1993) (internal quotations omitted).

**[19]** Instruction 16[14] uses two phrases — "moral evidence" and "moral certainty" — which to Rhoades both diminishes the importance of the reasonable doubt standard and offends *Cage*. In *Cage*, the Court addressed an instruction that defined reasonable doubt in part as "It must be such doubt as would give rise to a grave uncertainty, . . ." and "[A reasonable doubt] is an actual substantial doubt." The instruction then stated: "What is required is not an absolute or mathematical certainty, but a moral certainty." The Court held that the words "substantial" and "grave" connote a higher degree of doubt than required under the reasonable doubt standard and that, when considered with a reference to "moral certainty"

---

[14]Instruction 16 stated:

A defendant in a criminal action is presumed to be innocent until the contrary is proved and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt.

Reasonable doubt is defined as follows. It is not a mere possible doubt because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which after the entire comparison and consideration of all of the evidence leaves the minds of the jurors in that condition that they cannot say they have an abiding conviction to a moral certainty of the truth of the charge.

rather than evidentiary certainty, could allow a finding of guilt below that required by the due process clause.[15] After *Cage*, however, the Court in *Victor* directly addressed, and upheld, the constitutionality of a reasonable doubt instruction that had both phrases and was virtually identical to Instruction 16. *Victor*, 511 U.S. at 16-17. We also considered an instruction identical to the one given here (thus also to the instruction given in *Victor)* in another Idaho capital case, *Leavitt v. Arave*, 383 F.3d 809 (9th Cir. 2004), and found nothing constitutionally problematic. *Id.* at 822.

[20] As in *Victor*, Instruction 16 was accompanied by instructions that admonished jurors they could only base a decision on evidence presented in the case, and that they must have an "abiding conviction" of the truth of the charge. As the Court explained in *Victor*, this correctly states the burden of proof without reference to moral certainty. 511 U.S. at 14-15. Rhoades suggests that the jury could have taken the "moral certainty" language to refer to the ethics or morality of the charged offense, but we do not believe that, reading the instructions as a whole, it is reasonably likely the jury did understand the instruction this way. Accordingly, we conclude that Instruction 16, in light of the remaining instructions, passes constitutional muster.

[21] Instruction 17 indicates that the burden of proof is not intended to aid anyone who is in fact guilty to escape.[16] In

---

[15]The Court subsequently clarified that the proper inquiry is not whether the instruction "could have" been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it. *See Victor*, 511 U.S. at 6.

[16]Instruction 17 stated:

The rule of law which clothes every person accused of a crime with the presumption of innocence and imposes upon the state the burden of proving his guilt beyond a reasonable doubt is not intended to aid anyone who is in fact guilty to escape but is a humane provision of the law intended so far as human agencies can to guard against the danger of an innocent person being unjustly punished.

Rhoades's view, this essentially guts the presumption of innocence and requirement of proof beyond a reasonable doubt, allowing jurors who did not believe he was legally guilty — that is, guilty beyond a reasonable doubt — to vote to convict because they may have thought he was actually guilty. The state counters that Rhoades's challenge is *Teague*-barred because the Supreme Court has never addressed an instruction such as Instruction 17, nor is there a consensus among other courts that any such instruction is unconstitutional. *See Teague v. Lane*, 489 U.S. 288 (1989).

We start with *Teague*. *See Caspari v. Bohlen*, 510 U.S. 383, 389 (1994) (holding that if the state argues that the petitioner seeks the benefit of a new rule of constitutional law, the court must apply *Teague* before considering the merits). *Teague* generally precludes retroactive application of a new rule on collateral review.[17] "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301 (citations omitted). The state relies on *Leavitt*, where we examined an instruction identical to Instruction 17 and concluded that a decision invaliding the instruction for *Cage* error would be barred by *Teague* because *Cage*, which did announce a new rule, came down after Leavitt's conviction was final. The state recognizes that Rhoades's conviction became final after the decision in *Cage* was rendered, but argues that the same principle nevertheless applies because there was *still* no consensus that the instruction was constitutionally erroneous. We think otherwise, for it would run afoul of *Cage* if it were reasonably likely that the jury interpreted the instructions to allow a verdict on a stan-

---

[17]There are two exceptions, one for new rules that place conduct beyond the power of the government to proscribe, the other for watershed rules of criminal procedure. Neither is implicated here.

dard less than required by the due process clause. Therefore, the rule would not be retroactively applied.

[22] As we explained in *Leavitt*, the instruction itself is disfavored. *See* 383 F.3d at 819-21. We disapproved it on direct appeal in *Reynolds v. United States*, 238 F.2d 460, 463 (9th Cir. 1956), though not on constitutional grounds, as have other courts. *See Leavitt*, 383 F.3d at 819-21 (discussing cases); *see also Shaw v. United States*, 244 F.2d 930, 938 (9th Cir. 1957) (disapproving instruction but holding that we are not bound to reverse in every case where it is given). And we disapprove it again now. The vice in such an instruction is that a jury could believe it doesn't need to apply the presumption of innocence or hold the government to its burden of proving the defendant's guilt beyond a reasonable doubt if it thinks the defendant did it. However, this does not answer the question before us, which is whether it is reasonably likely that Instruction 17, in the context of the instructions overall, actually caused the jury to misapply the presumption of innocence or the state's burden of proof. We conclude that it did not.

[23] The trial court gave other instructions that properly defined the presumption of innocence, the burden of proof, and the jury's obligation to honor both. For example, the jury was told, more than once, that: Rhoades was presumed to be innocent unless and until he was proven guilty beyond a reasonable doubt; the state had the burden to prove every material allegation for each crime charged beyond a reasonable doubt, and the jury must be satisfied beyond a reasonable doubt that Rhoades is guilty of each offense; and its decision must be based solely on the evidence presented in court, not on any other consideration. We conclude that read together, the instructions overall resolved any ambiguity in Instruction 17, thereby leaving no reasonable probability the jury did not

understand they must apply the presumption of innocence and the reasonable doubt standard to Rhoades's case.[18]

**[24]** Rhoades asserts that Instruction 27[19] implicates *Winship*, but fails to develop an argument why it does. It doesn't, as we held in *Leavitt*. 383 F.3d at 822 (explaining that "the prosecution need not prove every *fact* in the case beyond a reasonable doubt so long as it proves every *element* beyond a reasonable doubt").

## IX

Rhoades asserts that trial counsel was ineffective in allowing a ballistics expert to disclose his reports to the prosecution. The defense first retained Richard Fox, who would have testified about the unreliability of ballistics evidence generally but was equivocal on whether the bullet from Baldwin's body matched the gun linked to Rhoades. Parmenter then consulted Ned Stuart to do a second comparison. Stuart concluded the bullet was fired from the gun associated with Rhoades, and sent his findings to Parmenter and to the prosecution. After the prosecution's expert testified at trial, the prosecutor indicated that he would present Stuart's findings in rebuttal if Fox were called. Parmenter did not call Fox.

---

[18]The Second Circuit reached a similar conclusion in *DelValle v. Armstrong*, 306 F.3d 1197 (2d Cir. 2002), where a petitioner challenged a similar instruction and "[t]he trial court repeatedly emphasized throughout its jury instructions that appellant was entitled to a presumption of innocence and that the state bore the burden of proving each element of the crime beyond a reasonable doubt." *Id*. at 1201.

[19]Instruction 27 stated:

It is not necessary that all the facts and circumstances surrounding the testimony and evidence that is given on behalf of the State shall be established beyond a reasonable doubt. All that is necessary is that all the facts and circumstances in evidence, together, shall establish the defendant's guilt beyond a reasonable doubt.

**[25]** The district court found that Rhoades could not establish prejudice because Fox's testimony would not have provided anything more than incremental assistance to the defense and much of the information that would have been presented through Fox was in evidence anyway. We agree. Parmenter admitted to the trial court that Fox's testimony would not have contradicted the government expert's. Parmenter also testified at his deposition that Fox's theories were out of the mainstream and likely to be unhelpful. And counsel's cross-examination of the prosecution's expert brought out the weaknesses in ballistics testing as Fox's testimony would have done, so the same ground was covered.

Rhoades's corresponding claim that he should have been given an evidentiary hearing is unsupported by argument. We will not find an abuse of discretion in these circumstances.

## X

Rhoades claims that counsel was ineffective in failing to investigate, develop, and present mental state issues.[20] Although Rhoades asserts that Parmenter was ineffective in handling mental state issues at trial as well as at sentencing, he develops no argument with respect to the guilt phase. Accordingly, we take it that Rhoades means to argue that at no time during the proceeding did counsel perform adequately with respect to mental health issues pertinent to sentencing. Otherwise, we deem any guilt-phase claim to be abandoned. *See Jones v. Wood*, 207 F.3d 557, 562 n.2 (9th Cir. 2000).

---

[20]Having previously dismissed Rhoades's claims of ineffective assistance of trial counsel for procedural default, the court reversed course in light of our decision in *Hoffman v. Arave*, 236 F.3d 523 (9th Cir. 2001), holding that Idaho's forty-two day limit for seeking post-conviction relief during which no new counsel was appointed frustrated the right to raise claims of ineffective assistance in state court. *Id.* at 530-36. It allowed Rhoades to develop the factual basis of his claim, and to file a proffer in support. Having considered the proffer, the court found no evidentiary hearing required and denied relief on the merits.

Relatedly, we must consider whether the district court abused its discretion in denying an evidentiary hearing on this claim.

### A

Parmenter's deposition was taken in May 1996 in the federal habeas proceedings. It shows that before trial, Parmenter spoke with a psychiatrist retained by Rhoades's attorneys in the Michelbacher and Haddon cases, and found out the results of this doctor's testing did not support an insanity plea. Based on this, his own knowledge of Rhoades, and his experience working with people at a mental hospital, Parmenter did not pursue further psychological testing. In preparation for sentencing, he talked to a lot of family members, several acquaintances, and to Rhoades's former employer. He spent twenty to twenty-five hours on it. Parmenter submitted a presentence report prepared by Daryl Gardner of Idaho Protective Specialists that included a statement from Rhoades professing his innocence; Rhoades's explanation for some prior arrests; and a brief description of his family, education, and relationships. In general, it highlighted Rhoades's positive characteristics, in particular with females. It also addressed Rhoades's childhood polio, how he was discriminated against due to his family's reputation, and his drug and alcohol use.

The state submitted a presentence report as well. It outlined Rhoades's criminal record, family information, interests and activities, education, and employment. Like Rhoades's, the state's report noted that he had polio as a child, that he sometimes had to fight just because his name was Rhoades, that he was not aggressive toward people or animals, that he often babysat his nieces and nephews, and that he was a skilled sheetrocker. Unlike Rhoades's report, the state's noted that Rhoades had applied to the Army and Marine Corps but had been turned down due to polio. In addition, it included a section on Rhoades's health, reciting that Rhoades denied having any mental or emotional problems, has a balance problem as

a result of his polio, and had used (and abused) drugs of all kinds for nineteen years. Finally, the state's report indicated that collateral contacts and family members described Rhoades's youth and early adulthood as "comparatively normal."

At the sentencing hearing, the state called no witnesses and Parmenter called twelve (Rhoades's mother, father, two sisters, two paternal aunts, and two paternal uncles; two friends; and two jail officials). Some noted Rhoades's childhood polio and foot surgeries, and how he was left poorly coordinated. Four mentioned his drinking, though they also indicated he was a less troublesome drunk than other members of his family. Several witnesses discussed how Rhoades was a good worker, and the jailors testified that he was well-behaved.

Parmenter's closing argument reiterated Rhoades's redeeming qualities and good character traits, noted that he hasn't had the easiest life, and expressed his own view that it was relatively tough growing up as a Rhoades. The state emphasized the circumstances of Baldwin's kidnapping and murder, and Rhoades's recent murder and kidnapping convictions.

Under Idaho law at the time of Rhoades's sentencing, when a person is convicted of first degree murder the judge determines whether at least one of ten statutory aggravating circumstances has been established beyond a reasonable doubt. *See* Idaho Code § 18-4004 (1988); *id.* § 19-2515. If at least one circumstance is found, the court "shall sentence the defendant to death unless the court finds that mitigating circumstances which may be presented outweigh the gravity of any aggravating circumstance found and make imposition of death unjust." *Id.* § 19-2515(c). The same mitigation inquiry is made in the case of first degree kidnapping if the judge finds, beyond a reasonable doubt, at least one of five statutory aggravating circumstances. *See id.* §§ 18-4504, 4505.

The trial judge found five aggravating circumstances on the murder conviction beyond a reasonable doubt: (1) Rhoades

was previously convicted by jury of the kidnapping and first degree murder of Susan Michelbacher, and pled guilty to the second degree murder of Nolan Haddon. *Id.* § 19-2515(g)(1). (2) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity, in that Rhoades cased the convenience store where Baldwin worked, snatched her from her place of employment, drove her to a secluded spot, attempted to attack her, and shot at her several times, finally hitting her as she was on her knees with her back towards him trying to escape. *Id.* § 19-2515(g)(5). (3) Rhoades exhibited utter disregard for human life; he shot at the victim several times, finally striking her in the back, and also left Baldwin alive to die in the cold one to one and a half hours later. *Id.* § 19-2515(g)(6). (4) Rhoades was guilty of murder in the first degree in perpetration or attempt to perpetrate rape, and/or robbery and/or kidnapping, planned to do these things, and in addition, used a firearm. *Id.* § 19-2515(g)(7). (5) Rhoades has exhibited a propensity to commit murder which will constitute a continuing threat to society; the Baldwin case is one of three similar type killings in which he had his victims subdued at gunpoint, and had no reason to be emotionally involved. *Id.* § 19-2515(g)(8).

With respect to the kidnapping conviction, the court found three aggravating circumstances beyond a reasonable doubt: (1) Baldwin would never willingly allow anyone to molest her or take her any place against her will; taking her to a secluded place, and the subsequent attack and shooting, which caused her to lay wounded for over an hour before she died, constitutes torture and grievous physical injury. Idaho Code § 18-4505(6)(a). (2) Rhoades knowingly created a great risk of death to Baldwin. *Id.* § 18-4505(6)(b). (3) Rhoades did not know the victim; considering her sensibilities, the abduction was especially heinous, atrocious and cruel, and manifested exceptional depravity. *Id.* § 18-4505(6)(d).

The trial judge acknowledged mitigating circumstances including age, background, gentleness, and drug use, as well

as the others that were argued, and found the historical facts
in accord with the presentence reports. The court observed
(among other things) that, although his family and friends say
Rhoades is easy going and gentle, he did intend to rob, kid-
nap, and kill Baldwin and his gentleness did not carry over to
the persons he abducted and later killed. It concluded that the
mitigating circumstances "do not outweigh the gravity of the
statutory    aggravating    circumstances."    Responding    to
Rhoades's post-conviction argument that the court had collec-
tively weighed the mitigating circumstances against all aggra-
vating circumstances, the trial judge clarified that he weighed
the mitigating circumstances collectively against *each* aggra-
vating circumstance. Thus, the fact that Rhoades was previ-
ously convicted of another murder outweighed the mitigating
circumstances.

In addition to taking Parmenter's deposition in the federal
habeas proceeding, Rhoades submitted a 1000-page proffer
that included declarations from Craig Beaver, Ph.D., a
neuropsychologist, Pablo Stewart, M.D., a psychiatrist and
neurologist, two police officers, members of Rhoades's fam-
ily and friends; medical records for Rhoades and his family;
criminal records for his father and other family members; his
elementary school transcript; and a family tree depicting drug
and alcohol abuse, suicide, intelligence, mental health, and
criminal convictions.

Dr. Beaver's declaration, which synthesized the other dec-
larations as well as the records in Rhoades's proffer, indicates
that Rhoades's father was intellectually deficient, physically
abused, and suicidal before marrying his mother; there was
extensive alcoholism and drug addiction in Rhoades's imme-
diate and extended family; reportedly Rhoades's parents beat
up at least some of their children and there was physical and
emotional abuse between his father and mother; Rhoades's
sister was sexually abused by cousins and an uncle, and there
were reports of "unhealthy sexual behaviors" among
Rhoades's sisters and extended family; one of Rhoades's sis-

ters told another sister that she had been sexually active with
Rhoades for years, and Rhoades entered into a sexual relation-
ship with his aunt after his uncle committed suicide;[21] and his
family had an extensive criminal history. Beaver further
stated that "[t]he alcoholism and suicides seen in the past gen-
erations of [Rhoades's] family very likely play a genetic role
in the emotional and mental health of [Rhoades] and his sib-
lings." His report concluded that Rhoades's family context
deprived him of normal development; his own medical prob-
lems further limited his potential as a human being; it was not
surprising that he had chemical dependency issues and knew
little about normal sexual and interpersonal relationships; his
drug addiction was overdetermined; he was genetically loaded
for substance abuse; his chronic use of methamphetamine
"may well have damaged his brain in areas critical to impulse
control and the ability to think clearly in high pressured situa-
tions"; and "further neurophysychological testing has always
been necessary to fully and adequately assess Paul Rhoades."

Based on Beaver's declaration and other items in the prof-
fer, Dr. Stewart provided a "working assessment regarding
psychiatric findings." He wrote that Rhoades was at signifi-
cant risk of developing a substance abuse disorder from an
early age; Rhoades inherited the diseases of alcoholism and
drug abuse; he was born into a family that suffered from
major mental illness and neuropsychological impairment;
multiple members of Rhoades's family have been institution-
alized, have been determined to have sub-average intelli-
gence, and have committed suicide — which puts Rhoades "at
substantial risk of developing his own mental health prob-

---

[21]No factual allegations with respect to either incestuous relationship in
which Rhoades participated, one with his sister (as recently as a few days
before his Nevada arrest) and another with an aunt after his uncle commit-
ted suicide, are made in the Third Amended Petition. We note that
Rhoades had asked for a similar allegation in his petition in the Michelb-
acher case to be deleted. In any event, it is unlikely that this would have
helped his mitigation case. *See* Idaho Code § 18-6602 (1988) (defining
incest and providing punishment for up to ten years imprisonment).

lems, including mood disorders, cognitive dysfunction, substance abuse, and suicidality"; Rhoades "may have been born with some mental deficiencies"; he was placed in special education classes in school; Rhoades's family is overwhelmingly positive for mental illness, which "places him at severe risk for developing his own mental health conditions"; and Rhoades's history, including polio, is "extremely suggestive of his suffering from post Traumatic Stress Disorder that had a childhood onset" even though the requirements of the DS-IV are not satisfied in all aspects. Stewart's "working assessment" listed diagnoses of Posttraumatic Stress Disorder, Cognitive Disorder NOS, Substance Induced Mood Disorder, and Substance Induced Psychotic Disorder, without further elaboration.

## B

Rhoades faults Parmenter for painting him as a fully aware and alert person in control of his faculties who chose to do what he was accused of doing. In Rhoades's view, this was the result of counsel's failure to conduct or complete an investigation, whereas a proper investigation would have uncovered mitigating evidence about his growing up in a family context of physical and emotional violence, alcohol, drugs, and sexual abnormality of the sort exemplified in the factual proffer that he made to the district court. The district court concluded that even if the factual allegations in the proffer were true, Rhoades failed to establish a Sixth Amendment claim under *Strickland*. While the court believed that Rhoades had alleged sufficient facts to show at least a colorable claim that counsel's investigation fell below an objective standard of reasonableness for a capital case in the late 1980s, it held there was no reasonable probability that had counsel conducted the type of mitigation investigation Rhoades believes he should, the outcome of the sentencing hearing would have been different. In the court's opinion, the aggravating circumstances were too strong, and the new mitigating evidence

added too little, to create a reasonable probability of a different outcome.

**[26]** "To prevail on this claim, [Rhoades] must meet both the deficient performance and prejudice prongs of *Strickland*." *Wong v. Belmontes*, 130 S. Ct. 383, 384 (2009) (per curiam). Accordingly, if Rhoades cannot meet "the highly demanding and heavy burden of establishing actual prejudice," *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (internal quotation marks and brackets omitted), it is unnecessary to determine whether Parmenter's performance was deficient, *see Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice that course should be followed."). We follow this course.

To demonstrate actual prejudice under *Strickland*, a " 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (quoting *Strickland*, 466 U.S. at 694). "To assess that probability, we consider the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding — and reweigh it against the evidence in aggravation." *Porter v. McCollum*, 130 S. Ct. 447, 453-54 (2009) (per curiam) (internal quotation marks and brackets omitted). Finally, "[i]n evaluating prejudice," Rhoades's "ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case." *Rios v. Rocha*, 299 F.3d 796, 808-09 (9th Cir. 2002) (internal quotation marks omitted).

**[27]** We agree with the district court's analysis. The aggravating circumstances that include two other murders are extremely strong. While the new evidence shows a more complete picture of Rhoades's immediate and extended family

and their abusive, often criminal, and alcoholic lives, even so, as the court found, there is no persuasive evidence that Rhoades himself was abused as a child, abandoned, placed in the state's custody, or otherwise institutionalized. Also as the court found, despite the passage of twenty years, the expert declarations do not conclusively fill in the blanks about Rhoades's mental or emotional state.

Beaver opined only that alcoholism and suicides in Rhoades's family "very likely" play a genetic role in his mental health; that he "was genetically loaded for substance abuse"; and that his chronic use of methamphetamine "may well" have damaged his brain. Stewart's working assessment is similarly indeterminate. For example, he stated that Rhoades's family history places him "at substantial risk" of developing his own mental health problems, and that he "may" have been born with some mental deficiencies. The mitigating value of Stewart's most concrete assessment, that Rhoades "does suffer" from Postraumatic Stress Disorder (PTSD), is lessened because his diagnosis admittedly does not satisfy the requirements of DSM-IV for this condition. *Cf. Comer v. Schriro*, 463 F.3d 934, 944 (9th Cir. 2006) (concluding the district court did not clearly err in determining the petitioner did not have PTSD in light of an expert's inability to apply the DSM-IV criteria accurately). There also is no suggestion that Rhoades kidnapped, tried to rape, or murdered Baldwin while in any kind of a PTSD-induced disassociative state.

[28] Speculation about potential brain dysfunctions or disorders "is not sufficient to establish prejudice." *Bible v. Ryan*, 571 F.3d 860, 871 (9th Cir. 2009); *see also Raley*, 470 F.3d at 802-03 (finding no prejudice in part because none of the petitioner's experts "conclusively opined that [he] had a mental defect"); *Smith v. Mitchell*, 348 F.3d 177, 201-02 (6th Cir. 2003) (finding no prejudice, and that new mitigating evidence of organic brain damage was "not compelling" as the petitioner's expert concluded there was only a "*likelihood* of neuro-

RHOADES v. HENRY (Baldwin)                3553

logical impairment"). In the main, both the Beaver and Stewart reports are speculative. They talk in terms of conditions that Rhoades "likely" has or "may" have. By contrast, expert opinions in cases where prejudice has been found identified injuries or conditions that the petitioner actually has.[22] Rhoades is certainly correct that a formal diagnosis is not necessary before an opinion may be considered, but this is not an issue in this case because the district court considered both reports, as do we. There is a difference between rejecting a proffered opinion, and concluding that it is not weighty enough to change the outcome. Rhoades is also correct that the quantity and quality of mitigation information in his experts' reports exceeds what was uncovered and presented by trial counsel. But this, too, misses the mark. As the Supreme Court recently reminded us, the determinative comparison is between "the totality of the available mitigation" and "the evidence in aggravation." *Porter*, 130 S. Ct. at 453-54.

[29] The sentencing court was aware of, but not persuaded by, several mitigating circumstances that are prominently featured in the proffer. It learned about Rhoades's drug and alcohol abuse from a variety of sources. The court also knew

---

[22]*See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (post-conviction experts found petitioner " 'suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions' "); *Wiggins*, 539 U.S. at 518 ("'[D]etailed social service records [ ] recorded . . . [petitioner's] borderline retardation.' "); *Williams v. Taylor*, 529 U.S. 362, 370 (2000) (post-conviction testimony showed petitioner "was 'borderline mentally retarded,' had suffered repeated head injuries, and might have mental impairments organic in origin"); *Lambright v. Schriro*, 490 F.3d 1103, 1111-12 (9th Cir. 2007) (post-conviction experts agreed petitioner "suffers from a depressive disorder and from polysubstance dependency" and petitioner's expert concluded he "suffers from a personality disorder with antisocial, borderline, and inadequate features"); *Stankewitz v. Woodford*, 365 F.3d 706, 718 (9th Cir. 2004) (three post-conviction experts agreed petitioner "is brain-damaged" and one expert concluded he "is borderline retarded" and "suffers from significant brain dysfunction").

about Rhoades's childhood health problems, including polio and foot surgeries, and the social and physical difficulties they caused. It was informed that Rhoades had limited education and was turned down by the armed forces. It was apprised of Rhoades's redeeming qualities by family and friends, who described him as a gentle, caring, and likable person until he started abusing drugs. The judge expressly recognized these positive traits, but concluded that they did not carry over to the persons Rhoades abducted and later killed. Thus, much of the newly adduced evidence is cumulative, and "adding it to what was already there would have made little difference." *Belmontes*, 130 S. Ct. at 387.

Even the more complete picture portrayed in the proffer of Rhoades's dysfunctional family with its alcoholism, abuse, aberrant sexual behavior, and criminal conduct does not depict a life history of Rhoades himself that is nightmarish as it was for the petitioners in cases such as *Rompilla*, *Wiggins*, and *Williams* where newly produced evidence in mitigation has carried the day. In *Rompilla*, the additional mitigation evidence showed that the petitioner was beaten by his father with his hands, fists, leather straps, belts and sticks, was subjected to yelling and verbal abuse, was locked by his father "in a small wire mesh dog pen that was filthy and excrement filled"; was isolated as a child without contact with other children; and suffered from organic brain damage that significantly impaired several of his cognitive functions. 545 U.S. at 391-92. The aggravating evidence was a murder committed during another felony and by torture, and a prior conviction for rape, burglary, and theft. In *Wiggins*, the petitioner experienced severe privation and abuse in his first six years of life, and physical torment, sexual molestation, and repeated rape thereafter in foster care. The aggravating evidence consisted solely of his crime, drowning a 77-year old woman in a bathtub and ransacking her apartment. In *Williams*, new evidence showed the petitioner had been severely and repeatedly beaten by his father, had been committed to the custody of the social services bureau, had no schooling beyond sixth grade, and

was borderline mentally retarded. The aggravating evidence included a previous conviction for armed robbery, burglary, and grand larceny before the murder for which he received the death penalty, and after it two auto thefts and violent assaults on elderly victims as well as an arson in jail.[23] By comparison, Rhoades's newly proffered evidence does not show that *he* was subjected to physical or verbal abuse as a child, or that he was abandoned or mistreated, placed within the state's custody, or institutionalized. While it is not necessary for abuse to have been aimed at Rhoades in order to be mitigating, that there is no evidence it was makes his case less compelling in light of the strength of the aggravating circumstances than the *Rompilla*, *Wiggins*, and *Williams* line of cases.

[30] The aggravating circumstances — a conviction for kidnapping, first degree murder, rape, and the infamous crime against nature (Michelbacher), and a conviction for second degree murder (Haddon), in addition to how Rhoades took Stacy Baldwin from work against her will, drove her to a secluded spot, tried to rape her, shot her in the back, and left her to die — are extraordinarily powerful. The new evidence in mitigation is tenuous. On balance, we conclude that Rhoades's newly proffered facts, taking them as true, add too little, and the aggravating circumstances are too strong, to make it reasonably probable that the sentencing decision would have been different but for counsel's performance.

---

**[23]***Cf. Porter*, 130 S. Ct. at 448-51 (counsel failed to present evidence the petitioner was his violent father's favorite target, had once been shot at by his father who beat him when the shot missed, had heroic military service, and suffered from brain damage that could manifest in violent, impulsive behavior; he had been convicted of another violent felony committed during a burglary and the same course of events that resulted in the murder for which he received the death penalty); *Pinholster v. Ayers*, 590 F.3d 651, 674-79 (9th Cir. 2009) (en banc) (the jury did not hear that petitioner suffered vicious and repeated physical abuse from his step-father and grandmother; had suffered organic, pre-frontal lobe brain damage; and was placed in a home for emotionally disturbed boys then in a state mental hospital).

**[31]** Consequently, Rhoades cannot satisfy the prejudice prong of *Strickland*, so his claim of ineffective assistance of counsel for failure to investigate and present mental state issues at sentencing fails.

### C

Rhoades asserts that he was entitled to an evidentiary hearing on this claim, but provides no argument in support. We take it he has none to make. Rhoades had an opportunity to develop a factual record and submitted a substantial proffer that the district court accepted. It found that even if the factual proffer were credible and proved, Rhoades could not establish prejudice. As explained, we agree. Rhoades points to no additional evidence that would be presented if an evidentiary hearing were held. In short, no abuse of discretion appears.

### XI

We must decide whether imposing the death penalty for first-degree kidnapping, when the perpetrator kills the victim, violates the Eighth Amendment.

**[32]** Rhoades maintains that because Idaho's kidnapping death penalty statute does not require the taking of a life, imposing a capital sentence is grossly disproportionate to the offense and is invalid under the Eighth Amendment and *Coker v. Georgia*, 433 U.S. 584 (1977), *Eberheart v. Georgia*, 433 U.S. 917 (1977), and *Enmund v. Florida*, 458 U.S. 782 (1982).[24] In *Coker*, the Supreme Court held that a death sentence is disproportionate punishment with respect to rape of an adult woman, noting that the rapist, as such, does not take human life. 433 U.S. at 598. The same day, the Court applied

---

[24]Death is not an element of first degree kidnapping in Idaho, Idaho Code § 18-4502. The death penalty may be imposed if the sentencing court finds at least one of several aggravating factors, none of which requires death. *Id.* § 18-4504(1); 18-4505(6).

*Coker* to kidnapping and rape of an adult woman. *See Eberheart*, 433 U.S. at 917. The Court again applied *Coker* in *Enmund* to invalidate imposition of the death penalty for aiding and abetting a felony that results in death when the defendant himself does not kill, attempt to kill, or intend that killing take place. *Enmund*, 458 U.S. at 801. *See also Kennedy v. Louisiana*, 128 S. Ct. 2641, 2646 (2008) (holding that the Constitution bars imposition of the death penalty for the rape of a child "where the crime did not result, and was not intended to result, in death of the victim").

[**33**] The district court held that neither *Coker*, *Eberheart*, nor *Enmund* bars imposition of the death penalty for Baldwin's kidnapping because the kidnapping did, in fact, result in death. Rhoades points out that the trial court did not consider Baldwin's death to be an aggravating circumstance in imposing the death penalty, but the trial court did find that Rhoades intended to shoot and kill Baldwin when he kidnapped her, and that he did shoot her and she died. This distinguishes Rhoades from Coker, Eberheart, and Enmund, who neither intended to kill their victims nor killed them. As *Kennedy* indicates with reference to these cases, the Court "has held that the death penalty can be disproportionate to the crime itself where the crime did not result, or was not intended to result, in death of the victim." 128 S. Ct. at 2650. Here, Rhoades intended for Baldwin to die when he kidnapped her, and he in fact took her life. When the kidnapper intends murder and in fact commits murder, the moral distinction between a "murderer" and a "robber," "rapist," or "kidnapper" that underlies the rationale in *Coker*, *Eberheart,* and *Enmund* dissolves. In these circumstances one is not left with an "abiding conviction" that the death penalty is excessive. *Coker*, 433 U.S. at 598.

Rhoades also claims that the death sentence for kidnapping involved "double-counting" the fact of Baldwin's murder contrary to Idaho law. However, state-law issues are not cog-

nizable on federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Therefore, we decline to consider it.

### XII

Rhoades asserts that the three statutory aggravating circumstances for kidnapping violate the Eighth Amendment because they permit imposition of death for a crime less than murder where the victim is an adult. He makes no argument in support. To the extent he challenges the aggravators for allowing the death penalty for less than murder, we have explained why it was not unconstitutionally imposed as to Rhoades. Whether Idaho's first degree kidnapping scheme is constitutional in some other case where death does not result is not before us. Beyond this, we decline to suppose what Rhoades has in mind.

### XIII

**[34]** Rhoades next submits that the evidence was constitutionally insufficient to prove the kidnapping aggravators. So long as any single aggravator is supported, constitutional infirmities as to the remaining ones are harmless. *See Pizzuto v. Arave*, 280 F.3d 949, 970-71 (9th Cir. 2002).

**[35]** We start with the circumstance in Idaho Code § 18-4505(6)(a), "torture, maiming or the intentional infliction of grievous mental or physical injury." Rhoades suggests there is no evidence showing intentional infliction of extreme and prolonged pain, which is the definition of torture. Regardless, there is ample evidence to support the finding with respect to intentional infliction of grievous mental or physical injury. Rhoades shot Baldwin three times and fired other shots at her while she was lying on the ground; Baldwin had sand under her fingernails and scattered scrapes; and she may have lingered, wounded, for an hour or so. At the archery range, Rhoades told Baldwin "Pray, you fucking cunt." Rhoades also argues that the abduction itself was not aggravated; he points

out that there was no sign of a struggle inside the store, and that the trip to the site where the body was found would take about four minutes. But Holm testified that Rhoades told him that Baldwin was screaming and hysterical in the truck. Further, Rhoades contends that the shooting cannot be used to establish the physical injury component because the killing itself would be the basis of a felony-murder charge that, in turn, could be the basis for a death sentence if the defendant had a specific intent to kill. However, a rational fact-finder could find intentional infliction of grievous mental or physical harm based on Baldwin's suffering before she died. To the extent Rhoades also makes a variation of his "double-counting" argument that turns on Idaho law, we do not reach it; to the extent he makes some other argument, he offers no authority in support. Finally, Rhoades attacks the credibility of witnesses such as Holm and the pathologist whose testimony supports the trial court's determination. But assessing the credibility of witnesses and weighing the evidence is for the trier of fact who, we presume, resolved both in favor of finding the aggravator.

[36]  After viewing the evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found aggravating factor (a) beyond a reasonable doubt. *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990) (applying the *Jackson v. Virginia*, 443 U.S. 307 (1979), standard to federal habeas review of a state court's finding of statutory aggravating factors). Given sufficiency of the evidence on this aggravator, we have no need to consider the others.

XIV

[37]  Rhoades asserts that his appellate counsel rendered ineffective assistance by failing to raise the unconstitutionality of the death penalty for kidnapping, and correspondingly that the district court should have held an evidentiary hearing on this claim. The only argument in support is that otherwise, his death sentence for first degree kidnapping would have

been reversed. Absent anything called to our attention about what counsel thought or how Idaho would likely have responded to such an argument, we cannot but conclude that counsel's performance was neither deficient nor prejudicial. *See Knowles v. Mirzayance*, 129 S. Ct. 1411, 1414 (2009) (holding that counsel's failure to assert a defense that was "almost certain to lose" did not violate "any 'prevailing professional norms' of which the Court is aware").

## XV

Victim impact statements were submitted as part of the presentence investigation report to the trial court. Baldwin's husband, for example, stated that "he wants the maximum sentence given to the man who killed Stacy"; that he believes in the death sentence; and that he didn't want Rhoades to do this to anyone else. Her mother-in-law related that the family favors a death sentence. Her mother stated that she hoped Rhoades "burns in hell for what he did to Stacy." She added that she was glad Stacy fought him, and that she approves of capital punishment. Rhoades contends that consideration of such statements offends his Eighth Amendment rights under *Booth v. Maryland*, 482 U.S. 496 (1987). In *Booth*, the Supreme Court held that the Eighth Amendment precludes (1) a description of the personal characteristics of the victim or emotional trauma suffered by the victim's family, and (2) a formal presentation of the family's opinions of the crime. *Id.* at 504-05, 508-09. *Booth* was overruled in part by *Payne v. Tennessee*, 501 U.S. 808 (1991), where the Court receded from a *per se* rule rejecting admissibility of the first type of evidence. *Id.* at 827. Both the Idaho Supreme Court and the district court held that any *Booth* error in this case was harmless.

**[38]** The family statements that Rhoades finds objectionable seem to us to fall more into the second — or still precluded — category than into the first. However, *Booth*'s concern that victim impact statements "can serve no other

purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant," 482 U.S. at 508, is not the same when, as here, a judge does the sentencing. We assume that the trial judge applied the law — *Booth*, at the time[25] — and considered only evidence that he knew was admissible. *See Landrigan v. Stewart*, 272 F.3d 1221, 1230 (9th Cir. 2001); *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998) (rejecting a similar argument as the judge can "separate the wheat from the chaff"). Thus, there was no error.

## XVI

**[39]** Rhoades's last challenge is to Idaho Code § 19-2719, which imposes a forty-two day time limit for the filing of post-conviction proceedings in capital cases whereas non-capital defendants have five years within which to pursue post-conviction relief. He submits this violates his right to due process and equal protection, but without explication. We resolved this otherwise in *Hoffman v. Arave*, 236 F.3d 523 (9th Cir. 2001), where we affirmed as to all challenges to Idaho Code § 19-2719 except to the extent it applied to ineffective assistance claims when no new counsel had been appointed.

AFFIRMED.

---

[25]*Booth* came down June 15, 1987. Rhoades was sentenced May 13, 1988.